Estado Libre Asociado de Puerto Rico
PANEL ESPECIAL (X)
DJ 2024-062C

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>RAÚL RODRÍGUEZ TORRES<br><br>Apelante | KLAN202401145 | APELACIÓN procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Crim. núm.: ISCR202300563, ISCR202300564<br><br>Sobre: Art. 130 CP, Art. 133.A |

Panel integrado por su presidenta la juez Lebrón Nieves, la jueza Romero García y el juez Rivera Torres.

**Rivera Torres, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 29 de abril de 2026.

Comparece ante este tribunal apelativo, el Sr. Raúl Rodríguez Torres (señor Rodríguez Torres o apelante), mediante el escrito intitulado *Apelación Criminal* de epígrafe y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (TPI), el 12 de diciembre de 2024, notificada el 16 de diciembre posterior. En virtud de este dictamen, el foro primario condenó al apelante a cumplir en reclusión carcelaria cincuenta (50) años por haber incurrido en violación al Artículo 130 del Código Penal, *infra,* y quince (15) años por el Artículo 133 (a) del mismo cuerpo de normas, a cumplirse de manera concurrente entre sí, más una pena especial con relación al Fondo de Relación de Víctimas y Testigos.

Por los fundamentos que expondremos a continuación, se confirma el dictamen apelado.

**I.**

Por hechos acaecidos en febrero de 2020, el Ministerio Público presentó acusaciones contra el señor Rodríguez Torres por infringir los Artículos 130 (Agresión Sexual) y 133(a) (Actos Lascivos) del Código Penal, *infra.* Mediante estas, se le imputó al apelante de manera ilegal, voluntaria, a propósito, y con conocimiento llevar a cabo una penetración sexual vaginal digital en contra de la menor C.M.O.S., que al día de los hechos no había cumplido los dieciséis (16) años de edad. De igual forma, se le acusó que, de manera ilegal, voluntaria, a propósito, y con conocimiento le tocó el seno a dicha menor para despertar, excitar o satisfacer su pasión o deseos sexuales.

El juicio por jurado se llevó a cabo durante varios meses para un total de seis (6) vistas, comenzando el 29 de julio de 2024 y culminando el 5 de septiembre siguiente.

La prueba documental del Ministerio Público consistió en los siguientes documentos:[1]

1. Informe pericial preparado por el Sr. Jose Iván Emilio García Couvertier.
2. Extracción en papel de conversación por WhatsApp a un teléfono propiedad de la Sra. Claribel Soto. (18 folios)
3. Informe de Extracción preparado por el Agente Dennis Méndez y Certificación (7 folios).
4. Fotografías tomadas por la Agente Glenda Morales Avilés (5).
5. Certificado de nacimiento de la menor C.M.O.S.
6. CD llamada al 911.
7. (1) Certificación de duplicado de grabación llamada al 9-1-1; y (2) Llamada al 9-1-1 (escrito).
8. Resumé del Sr. José Iván Emilio García Couvertier.
9. Advertencias de ley al acusado.
10. Notas de la Agente Glenda L. Morales Avilés.

Asimismo, el apelante presentó la siguiente evidencia documental:

1. Informe de la Agente Glenda L. Morales Avilés.
2. Hoja de entrevista a Claribel (tía de la menor).
3. Notas de la Agente Glenda L. Morales, del 16 de julio de 2024, de la entrevista a la Sra. Judith Soto Ramos.

---

[1] Advertimos que la parte apelante, en el recurso ante nuestra consideración, no impugna la evidencia documental.

    4. Notas de la Agente Glenda L. Morales de la entrevista a la Sra. Irma Pagán.

    5. Informe de Incidente PPR-621.1. 3 folios.

Por su parte, el Ministerio Público presentó los siguientes testigos de cargo:

    1. Agente Dennis Méndez Rodríguez
    2. Sra. Irma Pagán Pagán
    3. Sra. Claribel Soto Ramos
    4. La menor C.M.O.S.
    5. Sr. Jose Iván Emilio García Couvertier
    6. Agente Glenda L. Morales Avilés
    7. Agente José Sánchez Luciano

A su vez, la prueba testimonial del apelante consistió de los siguientes testigos:

    1. Sra. Sandra María de Fátima Seda Barleta
    2. Sra. Judith Soto Ramos
    3. Sr. David Lebrón Cuevas
    4. Sra. Santa Rodríguez Vega
    5. Sra. Efigenia Alequín
    6. Sra. Elsa Vargas Rodríguez

A continuación, consignamos un breve resumen de los testimonios:[2]

El <u>Agente de la Policía, Sr. Dennis Méndez Rodríguez</u>, declaró que pertenecía a la División de Crímenes Cibernéticos del área de Mayagüez.[3] Respecto a su participación en la investigación, relató que la Agente Glenda Morales Avilés de la División de Delitos Sexuales le trajo a su atención un caso donde necesitaba extraer una conversación de un teléfono móvil.[4]

Atestó que, dicho dispositivo era un iPhone modelo A2275 y que el registro fue consentido por la Sra. Claribel Soto Ramos.[5] Sostuvo que, de la extracción solo se entregó un *chat* así como dos contactos que eran parte de la investigación.[6] En el contrainterrogatorio, el Agente Méndez Rodríguez leyó una porción de los mensajes intercambiados del *chat* extraído.[7]

La <u>Sra. Irma Pagán Pagán</u> testificó que era Trabajadora Social del Departamento de la Familia.[8] Declaró que, el 4 de junio de 2021, le asignaron un referido referente al señor Rodríguez Torres que consistía en unas alegaciones de agresión sexual a una menor de dieciséis años, hijastra de este.[9] Acto seguido, relató que acudió a la Comandancia de la Policía de Mayagüez ya que las partes estaban en el mismo, es decir, el apelante, la

---

[2] Énfasis nuestro.
[3] *Véase*, Transcripción de la Prueba Oral (TPO) del 30 de julio de 2024, a la pág. 41, líneas 21-24.
[4] *Íd.*, a la pág. 45, líneas 10-17.
[5] *Íd.*, a la pág. 48, líneas 5-7 y 16-23.
[6] *Íd.*, líneas 8-15.
[7] *Íd.*, a la pág. 52, líneas 22-28; a las págs. 53 y 54, líneas 1-25.
[8] *Íd.*, a la pág. 59, líneas 8-11.
[9] *Íd.*, a la pág. 60, líneas 10-28; y a la pág. 61, líneas 1-10.

madre de la menor C.M.O.S. y la menor.[10] Allí, manifestó que entrevistó al Agente Sánchez Luciano, la menor, la mamá de esta y el señor Rodríguez Torres, en ese orden, respectivamente.[11]

Mencionó que, de la entrevista que le realizó al Agente Sánchez Luciano, este le indicó que la menor C.M.O.S. le había manifestado unas alegaciones de agresión sexual por parte del padrastro hacia su persona, ocurrido en febrero de 2020.[12] Así pues, indicó que cuando entrevistó a la menor C.M.O.S. esta le esbozó que, para febrero de 2020, su padrastro, el señor Rodríguez Torres, pasó a buscarla a la escuela porque su mamá, Sra. Judith Soto Ramos, se encontraba en el Supermercado Econo haciendo compras.[13] Por consiguiente, le expresó que una vez estaba en el carro con el apelante, y este le expresó que tenía una pareja fémina al igual que ella y que esta le introdujo el dedo en su vagina en la escuela.[14] Tras ello, la menor C.M.O.S. le narró que el señor Rodríguez Torres detuvo el vehículo y le dijo que la iba revisar, le quitó el pantalón y su ropa interior, y procedió a introducir su dedo en su vagina mientras le preguntaba si le dolía.[15]

Subsiguientemente, la menor C.M.O.S. contó que el apelante sacó su mano y ella se subió la ropa, a lo que el señor Rodríguez Torres le dijo que no le dijera a nadie ya que podía ir preso y procedió a chuparse el dedo.[16] Después, le relató que el apelante le pidió que le mostrara los senos y los tocó, entonces nuevamente le solicitó a la menor C.M.O.S. que no le dijera a nadie ni a su madre por temor a que fuera preso, acto seguido, procedieron a buscar a la mamá que se encontraba en el supermercado.[17] Por último, declaró que la menor C.M.O.S. le manifestó que los hechos ocurrieron en una carretera donde hay un cruce y un palo de mangó y que no se lo dijo a su madre ya que no le iba a creer.[18]

Respecto a la entrevista con la señora Soto Ramos, testificó que esta le indicó que tenía una relación con el señor Rodríguez Torres de hace diez (10) años, pero que empezaron a convivir de dos a tres semanas atrás.[19] **Dicho esto, le esbozó que no le creía a la menor C.M.O.S., que eran cuentos de ella y a quien le creía era a su esposo**.[20] Ante estas circunstancias, la Trabajadora Social optó por culminar la investigación con la señora Soto Ramos y continuó con el apelante.[21]

En primer lugar, a preguntas del Ministerio Público identificó al señor Rodríguez Torres en sala.[22] Así pues, declaró que el apelante negó que hubiese tocado a la menor C.M.O.S, sin embargo, admitió que la había buscado a la escuela y que ella le comentó que una compañera, amiga o pareja le había introducido el dedo

---

[10] *Íd.*, líneas 11-15.
[11] *Íd.*, líneas 18-22.
[12] *Íd.*, líneas 23-28; y a la pág. 62, líneas 1-2.
[13] *Íd.*, a la pág. 63, líneas 12-17.
[14] *Íd.*, líneas 17-21.
[15] *Íd.*, líneas 22-27.
[16] *Íd.*, a la pág. 64, líneas 1-4.
[17] *Íd.*, líneas 5-10.
[18] *Íd.*, líneas 11-17.
[19] *Íd.*, líneas 22-27.
[20] *Íd.*, a la pág. 65, líneas 1-4.
[21] *Íd.*, líneas 4-14.
[22] *Íd.*, líneas 15-20.

en su vagina.[23] **Le narró que, en ese momento, detuvo el vehículo frente al Parque Caracho localizado en Mayagüez en dirección hacia Río Cristal y procedió a bajarle la ropa a la menor C.M.O.S., no quitársela y, subsiguientemente, la tocó en el área de los ovarios preguntándole que si le dolía.**[24] Testificó que, el apelante negó haber introducido su dedo en la vagina de la menor C.M.O.S., al igual, afirmó que eran mentiras que se chupara el dedo y que le haya tocado un seno.[25] Además, **declaró que este le imploró que no le dijera a su esposa porque la menor C.M.O.S. se lo había pedido**.[26] Finalmente, atestiguó que, dado que la madre no era protectora, asumió custodia de la menor C.M.O.S. y la ubicó en casa de la abuela materna.[27]

Durante el contrainterrogatorio, la defensa le realizó preguntas a la señora Pagán Pagán respecto a si el apelante le bajó o le quitó el pantalón a la menor C.M.O.S.[28] **A lo que respondió que este se lo quitó**.[29] **Por otra parte, afirmó que la menor C.M.O.S. no le indicó qué mano o dedo utilizó el señor Rodríguez Torres.[30] De igual forma, aceptó que de la declaración jurada que realizó no surgía de que el apelante haya visto, tocado o realizado una expresión sobre los senos de la menor C.M.O.S**.[31]

La <u>Sra. Claribel Soto Ramos</u> declaró que la menor C.M.O.S. era su sobrina.[32] Relató que, el 4 de junio de 2021, la menor C.M.O.S. le hizo una llamada donde le dijo que la pareja de su madre le había dado.[33] A tales efectos, identificó al señor Rodríguez Torres en sala.[34] Subsiguientemente, testificó que su sobrina le narró que el apelante la había tocado, por lo cual le dijo que llamara a la policía.[35] Manifestó que, su sobrina le dijo que llamó a la policía y que estaba esperando a que llegaran.[36]

Expuso que, esa misma noche, obtuvo una llamada del Departamento de la Familia donde le informaron que tenían a la menor C.M.O.S. y que, si la podía aceptar en su casa, lo cual respondió que sí y la recibió a esos de la una o dos de la mañana.[37] Declaró que, la menor C.M.O.S. le contó que el señor Rodríguez Torres se estacionó en un sitio donde había unas casas, un puente y un árbol de mangó, y le dijo que se bajara los pantalones, luego, le introdujo el dedo en la vagina y le comentó que se untara aceite *baby oil* en los senos para que le crecieran.[38]

---

[23] *Íd.*, a la pág. 66, líneas 7-12.
[24] *Íd.*, líneas 12-20.
[25] *Íd.*, líneas 23-28.
[26] *Íd.*, línea 28; y a la pág. 67, líneas 1-5.
[27] *Íd.*, líneas 10-27.
[28] *Íd.*, a la pág. 88, líneas 13-28; a la pág. 89, líneas 1-11; y a la pág. 90, líneas 13-26.
[29] *Íd.*, a la pág. 88, línea 28; a la pág. 89, líneas 8-9; y a la pág. 90, líneas 13-17 y 24-26.
[30] *Íd.*, a la pág. 91, líneas 21-26.
[31] *Íd.*, a la pág. 94, líneas 1-10.
[32] *Íd.*, a la pág. 110, líneas 18-19.
[33] *Íd.*, líneas 26-28; y a la pág. 111, líneas 1-2.
[34] *Íd.*, líneas 3-8.
[35] *Íd.*, líneas 9-24.
[36] *Íd.*, a la pág. 112, líneas 3-9.
[37] *Íd.*, a la pág. 119, líneas 6-16.
[38] *Íd.*, líneas 17-24.

En el contrainterrogatorio la testigo afirmó que la **menor le mencionó que el señor Rodríguez Torres le dijo que se bajara los pantalones, pero no que le quitó la ropa**.[39] Esta también especificó que la menor le aseguró que este le introdujo el dedo en la vagina.[40] La testigo admitió que nunca ha tenido buena relación con *Raúl*.[41]

La <u>menor C.M.O.S.</u> testificó que tenía diecinueve años y que vivía sola, ya que fue removida de la custodia de su mamá, señora Judith Soto Ramos.[42] Relató que el señor Rodríguez Torres era la pareja de su madre, cuya profesión era taxista de carro público y lo identificó en sala.[43] Así pues, expuso que, para diciembre de 2019, vivía en casa de sus abuelos y que tenía unos vecinos que le daban "pon" a la escuela y que era el apelante quien la mayoría de las veces la traía a su casa.[44] Atestó que, para ese mes, le comentó a su madre y al señor Rodríguez Torres que era bisexual y que tenía pareja pero su mamá no lo tomó a bien, demostrando que estaba molesta y decepcionada en ella.[45] Declaró que, luego que les dijo a los dos sobre su predilección sexual, el apelante comenzó a preguntarle temas de índole sexual todos los días en el camino del colegio a su casa.[46] **Incluso, añadió que tenía la costumbre de tocarle la barbilla y jalarla hacia él, que intentó en una ocasión de besarla pero que lo esquivó, así como que tenía la costumbre de frotar su dedo en la rodilla de ella**.[47] Esbozó que, las preguntas que el señor Rodríguez Torres le realizaba la incomodaban por lo que intentaba evadir el tema, lo cual frustraba y molestaba al apelante, sin embargo, **señaló que nunca se lo comentó a su madre ya que sabía que no le iba a creer**.[48]

Así las cosas, relató que, para febrero de 2020, llamó al señor Rodríguez Torres para que la buscara al colegio pero que se iba tardar porque estaba transportando a un pasajero a su casa.[49] Testificó que, luego de que el apelante dejara al pasajero en su casa, le dijo a ella que se moviera a la parte de al frente del vehículo, lo cual hizo y se fueron para el Supermercado Econo debido a que la mamá de la menor se encontraba allí.[50] Declaró que, durante el viaje el señor Rodríguez Torres le volvió a preguntar sobre temas sexuales y que si había hecho algo con su pareja, por lo que esta vez le respondió que "sí" para ver si la dejaba en paz.[51] No obstante, expresó que el apelante le dijo que le iba a enseñar algo, por tanto, en camino al supermercado **detuvo el vehículo en un lugar solitario donde no transitaban muchos carros y que había un palo de mangó y un puentecito**.[52] Por consiguiente, indicó que el señor Rodríguez Torres le dijo que se bajara el pantalón pero

---

[39] *Íd.*, a la pág. 125, líneas 17-18; y 21-22.
[40] *Íd.*, a la pág. 126, líneas 19-21.
[41] *Íd.*, a la pág. 129, líneas 12-18.
[42] *Íd.*, a la pág. 138, líneas 20-28; y a la pág. 139, líneas 1-3.
[43] *Íd.*, líneas 18-23; y a la pág. 140, líneas 22-25.
[44] *Íd.*, líneas 4-6; y líneas 13-19.
[45] *Íd.*, a la pág. 141, líneas 3-18.
[46] *Íd.*, líneas 25-27; y a la pág. 142, líneas 1-14.
[47] *Íd.*, a la pág. 143, líneas 10-27; y a la pág. 144, líneas 1-11.
[48] *Íd.*, líneas 12-23; y a la pág. 145, líneas 2-12.
[49] *Íd.*, a la pág. 146, líneas 1-9.
[50] *Íd.*, líneas 9-15.
[51] *Íd.*, líneas 16-20.
[52] *Íd.*, líneas 21-28; y a la pág. 147, líneas 1-6.

luego que se lo quitara.[53] Ante ello, relató que se quedó "congelá", como "estática" y **procedió a bajarse los pantalones hasta las rodillas**.[54] Mencionó que, el apelante después le dijo que se quitara el *panty*, lo cual hizo y entonces el señor Rodríguez Torres se viró hacia donde ella y le introdujo el dedo de corazón de la mano izquierda a su vagina mientras le preguntaba que si le dolía o sentía algo.[55] **Declaró que, luego de que el apelante sacara su dedo, le dijo a ella que se subiera el pantalón, lo que hizo y el procedió a lamerse el dedo**.[56]

Subsiguientemente, testificó que el señor Rodríguez Torres después le preguntó sobre sus senos, ya que ella tenía una condición y pidió verlos, **por lo cual se subió su camisa y brasier, y se los enseñó**.[57] **Relató que, el apelante le apretó la tetilla del seno izquierdo y que le dijo que tenía senos lindos y que para que le crecieran debía echarse *baby oil* y masajearlos**.[58] Acto seguido, expresó que se puso la ropa y se fueron al supermercado a buscar a su madre.[59] Atestó que, en camino al supermercado el señor Rodríguez Torres estuvo diciéndole que no le dijera a nadie porque lo podían meter preso.[60] Así pues, narró que cuando llegaron al supermercado ella se metió adentro en un sitio donde el apelante no la pudiera ver pero que tampoco estuviera cerca de su madre y procedió a llamar a su pareja de aquel momento y le contó lo sucedido, sin embargo, no le dijo a su mamá ya que no le iba a creer.[61]

Transcurrido un tiempo, la menor C.M.O.S. relató que, el 4 de junio de 2021, denunció lo que había sucedido.[62] Explicó que, para esa fecha estaba viviendo en la casa del señor Rodríguez Torres con su mamá y que algo ocurrió con el *Wi-Fi* del hogar, por lo que le dijo a su madre que necesitaba internet ya que venían los exámenes del *College Board*.[63] Declaró que, los tres acudieron a T-Mobile para verificar los planes para ponerle data al teléfono, sin embargo, después de que la mamá vio las tarifas le dijo que no.[64] A tales efectos, manifestó que surgió una discusión entre su madre, el apelante y ella en el carro hasta que llegaron a la casa por el costo de la tarifa.[65] Señaló que, el señor Rodríguez Torres le profirió insultos y que le dio en el brazo, por lo que se metió en su cuarto y no salió hasta el próximo día.[66] Testificó que, el día siguiente, su mamá le pidió que la acompañara a Liberty para resolver el asunto del internet pero le dijo que no, ya que todavía estaba molesta lo cual causó otro altercado entre los tres, por lo que su madre y el apelante se fueron sin ella.[67] Agregó que, se encerró en su cuarto y

---

[53] *Íd.*, líneas 7-11.
[54] *Íd.*, líneas 12-15.
[55] *Íd.*, líneas 15-21.
[56] *Íd.*, líneas 22-24.
[57] *Íd.*, líneas 25-28; y a la pág. 148, línea 1.
[58] *Íd.*, líneas 1-4.
[59] *Íd.*, líneas 5-6.
[60] *Íd.*, líneas 10-14.
[61] *Íd.*, líneas 21-28; y a la pág. 149, líneas 1-25.
[62] *Íd.*, a la pág. 150, líneas 7-9.
[63] *Íd.*, líneas 10-20.
[64] *Íd.*, líneas 21-23.
[65] *Íd.*, líneas 24-28; y a la pág. 151, líneas 1-3.
[66] *Íd.*, a la pág. 150, líneas 27-28; y a la pág. 151, líneas 1-9.
[67] *Íd.*, líneas 10-19.

cuando regresaron su madre le tocó la puerta para pedirle ayuda con relación a unos papeles de Liberty, lo cual se negó y le cerró la puerta.[68] Por consiguiente, relató que su madre comenzó a gritarle y después de un silencio el señor Rodríguez Torres empezó a pegarle a la puerta y proferirle insultos.[69] En respuesta, mencionó que ella le pegó a la puerta y lo insultó para atrás, acto seguido, abrió la puerta y el apelante la intentó agarrar por el pelo pero termina dándole en la frente por lo que su madre se mete entre ellos.[70] Así pues, testificó que le dijo "te jodistes, cabrón" a lo que él respondió que la iba denunciar para que se largara de allí.[71] Posteriormente, explicó que llamó a su tía y le contó que el apelante le había pegado al igual que la había tocado, por lo que su tía le indicó que llamara a la policía, lo cual hizo y que la mantuvo al tanto mediante mensajes de textos.[72]

Declaró, además, que, durante la investigación acudió al sitio donde el señor Rodríguez Torres detuvo el vehículo con la Agente Morales Avilés.[73] Subsiguientemente, identificó en sala el lugar de los hechos mediante unas fotos tomadas por dicha agente.[74] A su vez, el Ministerio Público presentó una grabación de la llamada que realizó la menor C.M.O.S. al 9-1-1, en la cual identificó su voz.[75] Así pues, relató que luego de que llegó la policía y contó lo que ocurrió el año anterior se la llevaron a la Comisaría y que le quitaron el teléfono.[76] Allí, narró que le respondió unas preguntas a un señor y después llamaron al Departamento de la Familia donde la atendió la señora Pagán Pagán, la cual la entrevistó sobre lo sucedido en la casa y la situación del año anterior, y que luego se fueron a la casa de su abuela.[77] Testificó que, le contó a la Agente Morales Avilés todo lo que había sucedido el día de la discusión y que el apelante la había tocado.[78] **Declaró que, después de lo ocurrido en febrero de 2020, estaba afectada porque lloraba sin razón y que no quería que nadie la tocara porque le daba asco y terror**.[79] Manifestó que, fue a tal punto que su madre se quejaba por la falta de afecto y como no podía decirle lo que había sucedido, su mamá llamó a un psicólogo, sin embargo, a este tampoco le contó debido a una conversación que tuvo con la trabajadora social de la escuela.[80]

Durante el contrainterrogatorio, expresó que no aprobaba la relación de su mamá con el apelante ya que siempre tuvo "como una mala espina".[81] Testificó que le envió una carta a su tía Claribel diciéndole que no se

---

[68] *Íd.*, líneas 20-26.
[69] *Íd.*, 26-28; y a la pág. 152, líneas 1-5.
[70] *Íd.*, líneas 5-13.
[71] *Íd.*, líneas 14-18.
[72] *Íd.*, líneas 18-28; y a la pág. 153, líneas 1-10.
[73] *Íd.*, a la pág. 156, líneas 19-25.
[74] *Íd.*, líneas 26-27; y a la pág. 157, líneas 1-17.
[75] *Íd.*, líneas 23-28; y a la pág. 158, líneas 1-2. De las páginas 158-165 se produjeron para el récord, fragmentos de la llamada al 9-1-1 y el enlace con la Policía y la Línea de Maltrato del Departamento de la Familia.
[76] *Íd.*, a la pág. 165, líneas 23-28; a la pág. 166; y a la pág. 167, líneas 1-3.
[77] *Íd.*, líneas 4-20.
[78] *Íd.*, líneas 21-28; y a la pág. 168, líneas 1-2.
[79] *Íd.*, líneas 3-13.
[80] *Íd.*, líneas 14-28; y a la pág. 169, líneas 1-21.
[81] Transcripción de la Prueba Oral (TPO) del 31 de julio de 2024, a la pág. 190, líneas 4-8.

sentía segura con respecto al apelante.[82] Relató que luego de lo ocurrido bajó sus notas del colegio de tres cincuenta a tres con treinta y tres.[83]

La testigo confirmó que cuando le dijo al apelante "te jodiste" era que le iba a contar a la Policía lo que este le había hecho el año anterior.[84] **Aseveró que, estando en el carro del señor Rodríguez Torres le dijo que se bajara los pantalones y que no le mencionó a la señora Pagán Págan que el padrastro le quitó el pantalón y la ropa interior.[85] Esta reafirmó que a solicitud de él, se bajó el pantalón hasta las rodillas y este le introdujo su dedo del corazón de la mano izquierda en la vagina.[86] De igual forma, atestó que ella fue quien se alzó el brasier a solicitud del apelante y entonces le apretó el pezón izquierdo**.[87]

La menor aceptó que después de ese evento el apelante nunca la volvió a tocar.[88]

El <u>Sr. Jose Iván Emilio García Couvertier</u> declaró que era un Evaluador Forense en el Centro de Ayudas a Víctimas de Violación adscrito al Departamento de Salud de Mayagüez.[89] Tras unas preguntas de capacitación por parte del Ministerio Público, este último solicitó que el testigo sea considerado perito como Evaluador Forense en Abuso Sexual de Menores, lo cual el TPI aceptó.[90] Así, el Ministerio Público presentó el informe pericial realizado por el señor García Couvertier respecto a la menor C.M.O.S.[91] A tales efectos, relató que entrevistó a la menor por primera vez el 26 de agosto de 2021.[92] Manifestó que, ella le contó que estaba ahí ya que su padrastro la había tocado.[93] Luego, narró que la menor C.M.O.S. describió la relación con su padrastro como tóxica debido a que este le profería insultos como "hija de puta" y "malcría".[94] Además, esbozó que la menor le dijo que después **de que el apelante se enteró que era bisexual, este comenzó un comportamiento raro y todos los días le hacía preguntas de índole sexual y que le frotaba el muslo**.[95]

En cuanto el abuso sexual, declaró que la menor C.M.O.S. le manifestó que el señor Rodríguez Torres luego de haber llevado a un pasajero le dijo a ella que tenía que enseñarle algo, por lo cual la llevó a un sitio cerca del supermercado en una urbanización, pero como había gente se movió a un camino solitario donde se encontraba un palo de mango.[96] Allí, el apelante empezó a tocarle los muslos **y que le dijo que se bajara los pantalones y la ropa interior**, **acto seguido, le**

---

[82] *Íd.*, a la pág. 191, líneas 17-27.
[83] *Íd.*, a la pág. 196, líneas 1-15.
[84] *Íd.*, a la pág. 227, líneas 17-23.
[85] *Íd.*, a la pág. 241, líneas 11-27.
[86] *Íd.*, a la pág. 242, líneas 4-20.
[87] *Íd.*, a la pág. 254, líneas 14-26; a la pág. 257, líneas 8-9 y 27; y a la pág. 258, línea 1.
[88] *Íd.*, a la pág. 245, líneas 1-6.
[89] *Íd.*, a la pág. 270, líneas 24-26; y a la pág. 271, líneas 1-9.
[90] *Íd.*, a la pág. 279, líneas 23-27; y a la pág. 280, líneas 1-9.
[91] *Íd.*, a la pág. 281, líneas 6-26.
[92] *Íd.*, a la pág. 282, líneas 8-9.
[93] *Íd.*, a la pág. 284, líneas 21-25.
[94] *Íd.*, líneas 26-27; y a la pág. 285, líneas 1-8.
[95] *Íd.*, líneas 12-21.
[96] *Íd.*, a la pág. 286, líneas 3-12.

**introdujo el dedo hasta que se cansó por lo que ella procedió a subirse el pantalón y él se lambió el dedo, además, que el señor Rodríguez Torres le pidió que no le dijera a nadie ya que lo podían meter preso**.[97] A su vez, relató que durante la entrevista, la menor le dijo que padecía de una condición de los senos y que en aquel entonces el apelante le preguntó sobre esto, narró que **este le alzó la camisa, le quitó el brasier y le tocó los pezones, más aún, le dijo que tenía unos senos lindos y que tenía que echarse aceite para que le crecieran**.[98]

Testificó que, realizó una segunda entrevista con la menor C.M.O.S. el 8 de septiembre.[99] **Declaró que la menor le contó nuevamente sobre el evento de los senos, no obstante, narró que fue ella quien se alzó la camisa y el brasier.[100] A preguntas del Ministerio Público sobre el cambio de quién alzó la camisa, explicó que en cuestiones narrativas podían surgir algunos cambios, pero que la diferencia era mínima y que era un detalle minúsculo que podía ocurrir fácilmente, sin embargo que respecto al toque de los senos ella en ningún momento cambió.[101] Así pues, relató que el resto de la entrevista era bastante cónsona con la anterior.[102] Además, señaló que por la diferencia de palabras entre las entrevistas podía verse que la menor C.M.O.S. no estaba utilizando un libreto y la diferencia en palabras era normal**.[103]

**Declaró que, tras analizar la información obtenida notó una interrelación disfuncional entre la menor y su padrastro, sin embargo que no encontró elemento ni memoria inducida que la llevara a utilizar una alegación falsa**.[104] **Sostuvo que, después de ver la narrativa, la menor C.M.O.S. habló con bastantes descripciones, se mantuvo consistente en todo momento, no tuvo problemas en narrar los eventos de ninguna forma y también notó que no estaba utilizando un libreto por lo que descartó motivación o ganancia ulterior**.[105] De igual forma, testificó que lo verbalizado por la menor fue congruente, es decir, que usó vocabulario esperado y propio a su edad según la información que ella ofreció, a su vez, que pudo narrar todos los eventos desde su perspectiva y espontáneamente porque en ningún momento le ofreció información sino meramente le dijo "cuéntame que fue lo que pasó".[106] **Incluso, señaló que lo manifestado por la menor C.M.O.S. en las entrevistas colaterales que se hicieron fue consistente al igual que en las dos entrevistas que le realizó**.[107] **Por ello, concluyó que las alegaciones en contra de quien la menor C.M.O.S. identificó como su ofensor el señor Rodríguez Torres se sostenían**.[108]

---

[97] *Íd.*, líneas 13-20.
[98] *Íd.*, líneas 23-27; y a la pág. 287, líneas 1-3.
[99] *Íd.*, a la pág. 288, líneas 3-7.
[100] *Íd.*, líneas 13-22.
[101] *Íd.*, a la pág. 289, líneas 8-25.
[102] *Íd.*, líneas 26-27; y a la pág. 290, línea 1.
[103] *Íd.*, a la pág. 290, líneas 2-9.
[104] *Íd.*, a la pág. 295, líneas 13-20.
[105] *Íd.*, líneas 21-27; y a la pág. 296, líneas 1-5.
[106] *Íd.*, líneas 25-27; y a la pág. 297, líneas 1-22.
[107] *Íd.*, a la pág. 299, líneas 1-12.
[108] *Íd.*, a la pág. 302, líneas 1-9.

Durante el contrainterrogatorio, afirmó que la menor nunca le dijo que odiaba al apelante.[109] **Reafirmó que en la narrativa de los eventos pueden existir diferencias en las distintas entrevistas y enfatizó que la menor se "mantuvo en todo momento en cuestión a los actos medular[es] se mantuvo así que en cuestión de '*time*' como dije".**[110] Este aseguró que no preguntó sobre la relación de la menor C.M.O.S. y el apelante posterior al alegado incidente del 20 de febrero de 2020.[111]

La Agente de la Policía, la Sra. Glenda L. Morales Avilés, declaró que era parte de la División de Violencia Doméstica en Aguadilla.[112] Testificó que, tras haber sido notificada del caso, acudió al lugar donde estaba la menor y realizó entrevistas tanto a ella y a parte de los que se encontraban presentes.[113] Atestó que, la menor C.M.O.S. le narró que el 20 de febrero de 2020, el apelante la recogió en la escuela y luego de que este transportó a unos pasajeros la llevó a un callejón cerca del Supermercado Econo donde se encontraba su mamá.[114] No obstante, la menor le indicó que como habían personas la trasladó a otro lugar, en la cual había un puente y un palo de mango.[115] Relató que, en esa área la menor mencionó que el señor Rodríguez Torres le dijo que se bajara el pantalón y la ropa interior, lo cual hizo y que él inmediatamente con su mano izquierda le introdujo el dedo corazón mientras le preguntaba que si le dolía y que luego se lamió el dedo.[116] Subsiguientemente, declaró que la menor le contó que se subió la ropa y que el apelante le pidió que se alzara la camisa y su brasier y le tocó el seno, además, le dijo que se tenía que poner "baby oil" en los senos para que le crecieran.[117]

Por otra parte, sostuvo que durante la entrevista la menor C.M.O.S. le mencionó que, para diciembre o enero de ese mismo año, antes del suceso, le había verbalizado a su madre y al apelante que era bisexual, luego de eso, el señor Rodríguez Torres le empezó a preguntar sobre temas de índole sexual.[118] Así pues, describió que la menor C.M.O.S. mientras relataba los sucesos temblaba, se tocaba mucho, lloraba y estaba un poco ansiosa.[119] Posteriormente, atestó que citó al apelante a su oficina y que este asistió con su abogado y su esposa, señora Judith Soto Ramos.[120] A tales efectos, la Agente Morales Avilés señaló e identificó al señor Rodríguez Torres en sala.[121] Dicho esto, relató que entrevistó a la señora Soto Ramos quien era la madre de la menor C.M.O.S.[122] **No obstante, expuso que la madre no le creía a su hija de que el apelante la había tocado**.[123]

---

[109] *Íd.*, a la pág. 307, líneas 9-14.
[110] *Íd.*, a la pág. 308, líneas 9-10 y 20-22.
[111] *Íd.*, a la pág. 310, líneas 26-27; y a la pág. 311, líneas 1-7.
[112] *Íd.*, a la pág. 314, líneas 11-25.
[113] *Íd.*, a la pág. 315, líneas 16-27; y a la pág. 316, líneas 1-2.
[114] *Íd.*, a la pág. 318, líneas 2-24.
[115] *Íd.*, líneas 25-27; y a la pág. 319, líneas 1-3.
[116] *Íd.*, a la pág. 319, líneas 2-12.
[117] *Íd.*, líneas 12-16.
[118] *Íd.*, líneas 17-27; y a la pág. 320, líneas 1-17.
[119] *Íd.*, a la pág. 321, líneas 1-6.
[120] *Íd.*, líneas 21-26; y a la pág. 322, líneas 6-12.
[121] *Íd.*, líneas 1-5.
[122] *Íd.*, líneas 11-14.
[123] *Íd.*, a la pág. 323, líneas 1-6.

Por otro lado, manifestó que entrevistó a la señora Pagán Pagán y que a esta también la menor C.M.O.S. le había dicho que hace un año que el apelante la había tocado, que este introdujo su dedo en la vagina de ella luego de haber salido de la escuela en un lugar donde había un árbol de mango.[124] De igual forma, testificó que la Trabajadora Social, señora Pagán Pagán, le indicó que cuando entrevistó al señor Rodríguez Torres este le verbalizó que todo era mentira, además, que hizo referencia a un evento de cuando la menor C.M.O.S. le manifestó que su novia le había introducido el dedo y le dolía, **y que él se detuvo, que le bajó un poco su pantalón y que le tocó el área de la barriga, como los ovarios**.[125]

Declaró que, el 10 de julio de 2021, el apelante volvió a su oficina sin abogado para hablar, ya que en su primera citación su representación legal le aconsejó a que no hablara, pero él expresó que no tenía nada que esconder por lo que siendo un sospechoso nuevamente se le realizó las advertencias y firmó la renuncia, y que fue voluntaria sin mediar coacción, intimidación, violencia, presión o promesa alguna.[126] Así pues, expresó que el señor Rodríguez Torres negó las alegaciones y que eran mentiras.[127] **A su vez, testificó que entrevistó a la menor C.M.O.S. entre cuatro a cinco veces y que nunca cambió la versión**.[128]

En el contrainterrogatorio la testigo admitió que el apelante no mintió al expresarle que la menor tenía una condición de cáncer.[129] Asimismo, aceptó que la menor le dijo a la Trabajadora Social, señora Pagán Pagán, que el apelante le había quitado el pantalón y el *panty,* pero que a ella le mencionó que este le indicó que ella se lo quitara.[130] Además, la menor le verbalizó que ella fue quien se bajó el pantalón.[131]

Asimismo, a preguntas de la defensa, la Agente Morales Avilés afirmó que la menor le especificó que el apelante le dijo que se alzara la camisa y no que ella se la levantó.[132]

El <u>Agente de la Policía, el Sr. José Sánchez Luciano</u> atestó que, el 4 de junio de 2021, atendió una querella sobre discusión familiar.[133] Relató que, acudió al lugar con la Sargento Brenda Balaguer y ahí entrevistó a la señora Soto Ramos y al señor Rodríguez Torres.[134] Posteriormente, manifestó que entrevistó a la menor C.M.O.S. y que esta le narró que había tenido una discusión con el apelante.[135] Declaró que, la menor le dijo que para finales de diciembre de 2019 y a principios de enero de 2020, el señor Rodríguez Torres

---

[124] *Íd.*, a la pág. 324, líneas 10-27; y a la pág. 325, líneas 1-2.

[125] *Íd.*, líneas 4-24.

[126] *Íd.*, a la pág. 326, líneas 4-26; a las págs. 327-328; y a la pág. 329, líneas 7-10.

[127] *Íd.*, líneas 11-25.

[128] *Íd.*, a la pág. 332, líneas 23-27; y a la pág. 333, líneas 1-9.

[129] *Íd.*, a la pág. 351, líneas 6-11.

[130] *Íd.*, a la pág. 352, líneas 9-25.

[131] *Íd.*, a la pág. 353, líneas 1-11.

[132] *Íd.*, a la pág. 355, líneas 10-18.

[133] Véase, Transcripción de la Prueba Oral (TPO) del 1 de agosto de 2024, a la pág. 372, líneas 24-25; y a la pág. 373, líneas 1-3.

[134] *Íd.*, líneas 11-17.

[135] *Íd.*, a la pág. 374, líneas 1-6.

comenzó un comportamiento de índole sexual.[136] Así pues, expuso que la menor C.M.O.S. le contó que en febrero de 2020, el apelante después de haberla buscado en el colegio, la llevó a un callejón donde hay un árbol de mangó, cerca de la Urbanización Jardines y el Supermercado Econo, y le dijo que se quitara el pantalón y la ropa interior.[137] Luego de ello, le manifestó que el señor Rodríguez Torres le introdujo el dedo en sus partes íntimas, le apretó los senos y le dijo que eran lindos mientras se lambía el dedo del corazón de su mano izquierda, después le pidió que no le dijera a nadie.[138] Describió que, la menor C.M.O.S. se notaba afligida, llorosa y nerviosa mientras les contaba los sucesos.[139] Subsiguientemente, esbozó que transportaron a la menor C.M.O.S. al Distrito de Mayagüez, en cambio, al apelante y la madre de ella les dijo que pasaran al cuartel.[140]

En el contrainterrogatorio admitió que la menor no le habló sobre la blusa, del brasier ni que le tocaran los pezones.[141] Especificó que, en el informe preliminar que preparó, no indicó que ella le hubiese mencionado que le introdujeron un dedo a la vagina, pero sí especificó que la menor de 16 años alegó ser víctima de actos lascivos por un masculino de 71 años.[142]

El TPI celebró una vista de la Regla 109 de las Reglas de Evidencia para determinar la pertinencia del testimonio del Dr. Wendell Pagán Monsegur, Médico Generalista.[143] Ello, referente al documento intitulado Evaluación Médica para Examen Físico que este completó de la menor como paciente. Declaró que le realizó un examen físico superficial de oídos, nariz, garganta, auscultar los pulmones, y verificar la piel por encima. Ello, debido a que fue referida por el Departamento de la Familia por motivo de que iba a ser removida de un hogar. Una vez escuchado el testimonio, el TPI determinó que no lo permitiría.

La Sra. Sandra María de Fátima Seda Barleta declaró que era una abogada retirada, que ejercía actualmente como investigadora histórica y que conocía al señor Rodríguez Torres.[144] A tales efectos, identificó al apelante en sala.[145] Relató que, conoció a la señora Soto Ramos cuando era empleada del archivo histórico de Mayagüez y que desarrolló una relación con ella y la menor C.M.O.S., y que en ese momento tenía como cinco a seis años.[146] Manifestó que, tenía una relación bonita con la menor, pero que solo duró hasta que ella comenzó una etapa de rebeldía hace cinco o seis años atrás, en la cual ella desarrolló odio hacia su mamá y a distintas personas.[147] Ella describió la relación entre el apelante y la menor C.M.O.S. como una de protector,

---

[136] *Íd.*, líneas 7-9.
[137] *Íd.*, líneas 9-14.
[138] *Íd.*, líneas 14-19.
[139] *Íd.*, líneas 20-22.
[140] *Íd.*, líneas 23-26.
[141] *Íd.*, a la pág. 383, líneas 20-25.
[142] *Íd.*, a la pág. 385, líneas 22-27; y a la pág. 386, líneas 2-3.
[143] *Íd.*, a la pág. 422-430.
[144] *Íd.*, a la pág. 435, líneas 20-26; y a la pág. 436, líneas 1-3.
[145] *Íd.*, líneas 4-7.
[146] *Íd.*, líneas 14-19.
[147] *Íd.*, a la pág. 437, líneas 15-20; y a la pág. 438, líneas 1-6.

sin embargo que ella lo rechazaba mucho desde que captó que era pareja de su madre.[148]

La testigo declaró, además, que la menor le dijo que la relación entre su mamá y el apelante no iba para ningún lado y "eso lo acabo yo."[149] Añadió que, esa expresión se lo dijo cuando la menor tenía más o menos 12 años y la próxima vez como un año después.[150] **No obstante, señaló que, en la última conversación con la menor, hacía como cinco (5) años, los sentimientos de esta hacia el apelante eran positivos**.[151]

**En el contrainterrogatorio la testigo aclaró que la menor C.M.O.S., cuando ella llamó a su mamá, cogió el teléfono para saludarla y es entonces que le dice que la relación no va para ningún lado**.[152]

En el redirecto, esta subrayó que la menor tenía esa actitud porque tenía una pareja lésbica y en su hogar nadie estaba de acuerdo.[153]

La <u>Sra. Judith Soto Ramos</u> declaró que era madre de la menor C.M.O.S. y que actualmente residía con el señor Rodríguez Torres, su esposo, quien identificó en sala.[154] Manifestó que, ella y la menor C.M.O.S. se mudaron a la casa del apelante para mayo de 2021.[155] Así pues, narró que, el 3 de junio de 2021, supuestamente su hija estaba estudiando para el *College Board,* pero tanto el internet de Liberty como el del celular de la menor no funcionaban por lo que acudieron a la tienda de Liberty para sacar un teléfono nuevo.[156] Allí, relató que le dijo a su hija que no podía comprarle un celular nuevo que costaba $2,000 y que iba averiguar si cualificaba para la ayuda que estaba ofreciendo el Gobierno.[157] Atestó que, cuando llegaron a la casa la menor se fue a su cuarto y se encerró diciéndole que no quería hablar con ella ni comer, ya que estaba molesta.[158] Testificó que, al día siguiente, durante la mañana vio a la menor bregando con el internet y pues acudió con el señor Rodríguez Torres nuevamente a Liberty para que le notificaran donde estaba la avería o alternativas para conseguirle a su hija un celular nuevo.[159]

Expresó que, cuando regresó a la casa le informó a su hija que cualificaban, sin embargo, ella se encerró en su cuarto y comenzó a proferir palabras soeces y tirarle puños a la puerta.[160] Declaró que, le pidió que le abriera la puerta pero que hizo caso omiso, entonces el apelante le tocó la puerta y la menor C.M.O.S. procedió a abrirla y a tirar puños, por lo que se metió entre ellos.[161] Narró que, el señor Rodríguez Torres esquivó uno de los puños y que eso causó que le tocara la frente

---

[148] *Íd.*, líneas 11-21.
[149] *Íd.*, a la pág. 439, líneas 18-22.
[150] *Íd.*, a la pág. 440, líneas6-12; y a la pág. 441, líneas 4-6.
[151] *Íd.*, a la pág. 442, líneas 18-24.
[152] *Íd.*, a la pág. 450, líneas 1-27.
[153] *Íd.*, a la pág. 455, líneas 4-9.
[154] *Íd.*, a la pág. 460, líneas 13-20; y a la pág. 461, líneas 21-22.
[155] *Íd.*, líneas 10-15.
[156] *Íd.*, a la pág. 462, líneas 4-14.
[157] *Íd.*, líneas 15-26.
[158] *Íd.*, a la pág. 463, líneas 2-8.
[159] *Íd.*, líneas 8-23.
[160] *Íd.*, a la pág. 464, líneas 2-22.
[161] *Íd.*, líneas 23-25.

sin querer a la hija, a lo cual ella respondió "Cabrón te voy a joder ahora, tú no eres mi padre y me tocastes [*sic*]", por ende, la señora Soto Ramos llamó a la policía para que la orientaran de qué hacer con su hija.[162]

Aseveró que, llegó la policía y le explicó la situación, pero que luego se personaron otros oficiales que hablaron con la menor.[163] Acto seguido, testificó que la señora Pagán Pagán se llevó a la menor C.M.O.S. para la Comandancia.[164] Narró que, acudió a la Comandancia con el apelante preguntando por su hija.[165] Relató que, eventualmente se encontró con el Agente Sánchez Luciano quien le notificó que había entrevistado a la menor y que el señor Rodríguez Torres la tocó, lo cual ella respondió que era mentira.[166] Declaró que, luego de ese día solo volvió a ver a su hija el 10 de agosto antes de ella irse para la universidad, pero que más nunca.[167]

Durante el contrainterrogatorio, afirmó que cuando le informaron que el apelante había tocado a la menor C.M.O.S. esta sin conocer detalle de cuándo o como ocurrieron los hechos manifestó que no le creía a su hija.[168] **Subrayó que la menor nunca le dijo que odiara al apelante**.[169] **Explicó que la familia aceptaba que la menor era bisexual y no necesitaban consejo alguno para bregar con la situación**.[170] **Indicó que la menor le expresó que iba a acabar con la relación así como al apelante y a la licenciada Fátima, pero desconoce cómo se lo dijo**.[171]

En el redirecto **expresó que no le creyó la versión de su hija porque ella odiaba al apelante**.[172] **En el recontrainterrogatorio la testigo respondió que la menor le hacía llamadas a la licenciada Fátima desde que tenía seis años**.[173]

El <u>Sr. David Lebrón Cuevas</u> testificó que conocía al señor Rodríguez Torres desde hace treinta y cinco o cuarenta años y que era una persona honesta que no tenía vicios, además lo identificó en sala.[174]

La <u>Sra. Santa Rodríguez Vega</u> atestó que conocía al apelante hace treinta y cinco años y que tenía una reputación muy buena.[175] A tales efectos, lo identificó en sala.[176]

La <u>Sra. Efigenia Alequín</u> identificó al señor Rodríguez Torres en sala.[177] Relató que, lo conocía desde que

---

[162] *Íd.*, línea 26; y a la pág. 465, líneas 1-12.
[163] *Íd.*, a la pág. 467, líneas 13-22; y a la pág. 468, líneas 2-16.
[164] *Íd.*, a la pág. 469, líneas 1-23.
[165] *Íd.*, a la pág. 470, líneas 1-12.
[166] *Íd.*, líneas 13-26.
[167] *Íd.*, a la pág. 471, líneas 14-21; y a la pág. 473, líneas 5-7.
[168] *Íd.*, a la pág. 488, líneas 16-26; a la pág. 489, líneas 5-13; y a la pág. 490, líneas 12-17.
[169] *Íd.*, a la pág. 513, líneas 4-9.
[170] *Íd.*, a la pág. 517, líneas 6-14.
[171] *Íd.*, líneas 15-25.
[172] *Íd.*, a la pág. 525, líneas 8-18.
[173] *Íd.*, a la pág. 529, líneas 12-22.
[174] Véase, Transcripción de la Prueba Oral (TPO) del 3 de septiembre de 2024, a la pág. 542, líneas 1-13; y a la pág. 543, líneas 3-8.
[175] *Íd.*, a la pág. 546, líneas 13-16; y a la pág. 547, líneas 1-2.
[176] *Íd.*, a la pág. 546, líneas 17-21.
[177] *Íd.*, a la pág. 548, líneas 14-20.

nació, ya que eran vecinos y lo describió como una persona buena y responsable.[178]

La <u>Sra. Elsa Vargas Rodríguez</u> declaró que el apelante era su vecino y cuñado, y que era una persona intachable.[179]

Aquilatada la veracidad de los testimonios; así como la prueba documental presentada, el jurado rindió un veredicto de culpabilidad por los delitos de agresión sexual y actos lascivos. Por tal razón, el 12 de diciembre de 2024, el TPI dictó la *Sentencia* apelada imponiendo las siguientes penas, a cumplirse concurrentes entre sí:

Artículo 130 del Código Penal, *infra* – 50 años de prisión;

Artículo 133 (A) del Código Penal, *infra* – 15 años de prisión;

Más una pena especial con relación al Fondo de Relación de Víctimas y Testigos.

Inconforme, el 20 de diciembre de 2024, el apelante acude ante este foro intermedio imputándole al TPI la comisión del siguiente error:[180]

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ACEPTAR UN VEREDICTO AUN CUANDO NO SE PROBÓ EL CASO MÁS ALLÁ DE DUDA RAZONABLE.

El 9 de enero de 2025, emitimos una *Resolución* concediéndole a la parte apelante el término de diez (10) días para acreditar, conforme lo dispuesto en la Regla 76 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, págs. 105-108, 215 DPR __ (2025), si para la atención del error señalado es necesario la reproducción de la prueba oral desfilada durante el juicio. Además, le especificamos que, de entenderla necesaria, deberá indicar el método que utilizará para dicha reproducción.

---

[178] *Íd.*, líneas 21-26; y a la pág. 549, líneas 22-25.
[179] *Íd.*, a la pág. 551, líneas 15-25.
[180] En el recurso intitulado *Alegato del Apelante* se señala que se desiste del segundo error identificado como *B.*, en el escrito inicial titulado *Apelación Criminal.*

Conforme a lo ordenado, el 24 de enero de 2025, el señor Rodríguez Torres presentó una *Moción en Cumplimiento de Orden* informando que para la atención del error señalado era necesaria la reproducción de la prueba oral desfilada y que esta será presentada mediante una transcripción escrita.

Atendida la moción, y luego de varios trámites apelativos relativos a la transcripción de la prueba, el 29 de julio de 2025, emitimos una *Resolución* en la que dimos por estipulada la TPO presentada el 12 de julio de 2025.

Posterior a ello, el 10 de septiembre de 2025, el señor Rodríguez Torres presentó su *Alegato del Apelante*. Así, el 11 de septiembre de 2025, emitimos una *Resolución* concediéndole a la parte apelada hasta el 10 de octubre de 2025, para presentar su oposición. Tras una prórroga, el 10 de noviembre de 2025, el Ministerio Público presentó su *Alegato del Pueblo de Puerto Rico*, por lo que, decretamos perfeccionado el recurso.

Analizadas las comparecencias de las partes, el expediente apelativo, los autos originales y la TPO; así como estudiado el derecho aplicable, procedemos a resolver.

## II.

**El Código Penal y los delitos contra la indemnidad sexual**

En lo aquí pertinente, el Código Penal de 2012, según enmendado, tipifica los delitos imputados en el caso de epígrafe de la siguiente manera.

El Artículo 130, 33 LPRA sec. 5191, dispone que:

> Será sancionada con pena de reclusión por un término fijo de cincuenta (50) años, que deberá cumplir en años naturales, más la pena de restitución, salvo que la víctima renuncie a ello, toda persona que, a propósito, con conocimiento o temerariamente lleve a cabo, o que provoque que otra persona lleve a cabo, un acto orogenital o una penetración sexual vaginal o anal ya sea ésta genital, digital, o instrumental, en cualquiera de las circunstancias que se exponen a continuación:
> (a) Si la víctima al momento del hecho no ha cumplido dieciséis (16) años, salvo cuando la víctima es mayor de

catorce (14) años y la diferencia de edad entre la víctima y el acusado es de cuatro (4) años o menos.
[...]

Asimismo, el Artículo 133 (a), 33 LPRA sec. 5194, del mismo cuerpo de normas establece que:

> Toda persona que, a propósito, con conocimiento o temerariamente, sin intentar consumar el delito de agresión sexual descrito en el Artículo 130, someta a otra persona a un acto que tienda a despertar, excitar o satisfacer la pasión o deseos sexuales del imputado, en cualquiera de las circunstancias que se exponen a continuación, será sancionada con pena de reclusión por un término fijo de ocho (8) años, más la pena de restitución, salvo que la víctima renuncie a ello:
>
> (a) Si la víctima al momento del hecho es menor de dieciséis (16) años de edad.
>
> [...]
>
> Cuando el delito se cometa en cualquiera de las modalidades descritas en los incisos (a) y (f) de este Artículo, o se cometa en el hogar de la víctima, o en cualquier otro lugar donde ésta tenga una expectativa razonable de intimidad, la pena del delito será de reclusión por un término fijo de quince (15) años más la pena de restitución, salvo que la víctima renuncie a ello.
>
> [...]

**El concepto de duda razonable**

La Constitución de Puerto Rico garantiza el derecho de todo acusado en procesos criminales a gozar de la presunción de inocencia. Artículo II, Sec. 11, Const. ELA, LPRA, Tomo I. Para poder rebatir esa presunción, se exige que el Estado presente prueba, más allá de duda razonable, sobre todos los elementos del delito y su conexión con el acusado. *Pueblo v. García Colón*, 182 DPR 129, 174 (2011); *Pueblo v. Santiago et al.*, 176 DPR 133, 142 (2009); *Pueblo v. Irizarry*, 156 DPR 780, 786 (2002); *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

Cónsono con lo anterior, la Regla 110 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, dispone, en lo pertinente, que "[e]n todo proceso criminal, se presumirá inocente al acusado mientras que no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá…". Para cumplir con ese

rigor probatorio, nuestro sistema de justicia criminal requiere que la prueba que presente el Ministerio Público sea suficiente en derecho, lo que significa que la evidencia presentada tiene que producir certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Rosario Reyes*, 138 DPR 591, 598 (1995); *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986); *Pueblo v. Carrasquillo Carrasquillo,* 102 DPR 545, 552 (1974).

Lo anterior no implica que la culpabilidad del acusado tenga que establecerse con certeza matemática. La duda razonable tampoco se refiere a especulaciones del juzgador, sino que es una duda fundada que surge como producto del raciocinio de todos los elementos de juicio presentes en el caso. *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985); *Pueblo v. Cruz Granados,* 116 DPR 3, 21-22 (1984). Además, para justificar la absolución de un acusado, la duda razonable debe surgir de manera serena, justa e imparcial, luego de que el juzgador considere la totalidad de la evidencia del caso o de la falta de suficiente prueba que apoye la acusación. *Pueblo v. Irizarry*, supra, a la pág. 788. En conclusión, la duda razonable es la insatisfacción de la conciencia del juzgador con la prueba presentada. *Pueblo v. Cabán Torres*, supra, a la pág. 652.

**Apreciación de la prueba y estándar de revisión apelativa**

Por último, cuando estamos ante una revisión en la esfera criminal, nuestro Tribunal Supremo ha establecido que los foros apelativos no debemos olvidar que el juzgador de los hechos en primera instancia está en especial ventaja al momento de aquilatar la prueba y los testimonios presentados. *Pueblo v. De Jesús Mercado*, 188 DPR 467, 477-478 (2013); *Pueblo v. Rosario Reyes*, supra, a las págs. 598-599 (1995). Por tanto, la apreciación hecha a ese nivel merece gran respeto. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 259 (2011).

El Tribunal Supremo en *Pueblo v. Irizarry*, supra, a las págs. 788-789, reiterado en *Pueblo v. Casillas, Torres*, 190 DPR 398, 416 (2014) expresó:

> [E]n el ejercicio de tan delicada función revisora, no podemos abstraernos de las limitaciones que rigen el proceso de evaluación de la prueba por parte de un tribunal apelativo. Al enfrentarnos a la tarea de revisar cuestiones relativas a convicciones[sic] criminales, siempre nos hemos regido por la norma a los efectos de que la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador [...].

Ahora bien, esta doctrina de deferencia judicial no es absoluta y cede ante las posibles injusticias que pueda acarrear las determinaciones de hechos que no estén sustentadas por la prueba desfilada ante el foro primario. Los tribunales apelativos solo intervenimos con la apreciación hecha cuando se demuestre satisfactoriamente la existencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Maisonave*, 129 DPR 49, 63 (1991). Es ante la presencia de alguno de estos elementos, o cuando la apreciación de la prueba no concuerde con la realidad fáctica, o sea inherentemente increíble o claramente imposible, es que intervendremos con la apreciación formada. *Pueblo v. Irizarry*, supra, a la pág. 789. Además, cuando la evidencia directa de un testigo le merece entero crédito al juzgador de hechos, ello constituye prueba suficiente de cualquier hecho. *Rivera Menéndez v. Action Services*, 185 DPR 431, 444 (2012).

Por tal razón, el testimonio vertido por un testigo principal, por sí solo, de ser creído, es suficiente para sostener un fallo condenatorio, a pesar de no haber sido "perfecto", pues es el juzgador quien le corresponde resolver la credibilidad cuando haya partes de lo testificado que "no sean aceptables". *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995). Es decir, el hecho de que un testigo se haya contradicho o faltado a la verdad respecto a uno o más particulares no implica que se deba descartar el resto de la

declaración. *Pueblo v. Espinet Pagán*, 112 DPR 531, 536 (1982); *Pueblo v. López Rivera*, 102 DPR 359, 365-366 (1974); *Pueblo v. Méndez Feliciano*, 90 DPR 449, 450 (1964). De igual forma, algunas contradicciones u omisiones sobre hechos no esenciales, no obliga al juzgador a descartar toda la prueba. *Pueblo v. Reyes Morán*, 121 DPR 786,794 (1989); *Pueblo v. Feliciano Hernández*, 113 DPR 371, 373 (1982).

En este sentido, contradicciones respecto a detalles de los hechos no es impedimento para que no se le dé crédito a un testimonio, cuando nada increíble o improbable surge del mismo. *Pueblo v. Chévere Heredia*, supra, a la pág. 20; *Pueblo v. Arroyo Núñez*, 99 DPR 842, 849 (1971). A tales efectos, en *Pueblo v. Chévere Heredia*, supra, a la pág. 20, nuestro máximo foro rehusó descartar completamente un testimonio aun cuando contenía contradicciones mínimas insustanciales, ya que nada de lo atestado era increíble o inverosímil a tal extremo que haya que descartarlo.

**III.**

Mediante su único señalamiento de error, el apelante esbozó que el TPI incidió al aceptar un veredicto de culpabilidad, aun cuando no se probó el caso más allá de duda razonable. En esencia, señaló que de los testimonios vertidos por los testigos del Ministerio Público se apreciaban múltiples contradicciones sobre los hechos con respecto a elementos medulares, por lo que procedía su absolución.

Para poder rebatir la presunción de inocencia, nuestro ordenamiento exige que el Estado presente prueba, más allá de duda razonable, sobre todos los elementos del delito y su conexión con el acusado. *Pueblo v. García Colón*, supra, a la pág. 174; *Pueblo v. Santiago et al.*, supra, a la pág. 142; *Pueblo v. Irizarry*, supra, a la pág. 786; *Pueblo v. Acevedo Estrada*, supra, a la pág. 99. Ahora bien, esto no implica que la culpabilidad del acusado se establezca con

certeza matemática, sino que la prueba presentada sea suficiente para producir "aquella certeza moral que convence, dirige la inteligencia y satisface la razón". *Pueblo v. Bigio Pastrana*, supra, a la pág. 761; *Pueblo v. Cruz Granados*, supra, a las págs. 21-22. Dicho esto, la duda razonable no es una especulativa o imaginaria, más bien, es aquella fundada, producto del "raciocinio de todos los elementos de juicio envueltos en el caso". *Íd.* De igual manera, puntualizamos que cualquier evidencia directa de un testigo que merezca entero crédito al juzgador es suficiente para probar cualquier hecho. *Rivera Menéndez v. Action Services*, supra, a la pág. 444.

Así, tras un análisis íntegro y minucioso de la totalidad del expediente del caso que nos ocupa, juzgamos que el Ministerio Público evidenció, más allá de duda razonable, los elementos de los delitos imputados en contra del señor Rodríguez Torres. En primer lugar, resulta indispensable indicar que para la fecha de los hechos la menor C.M.O.S. tenía quince años.[181] Dicho esto, del testimonio vertido por ella surge que, para febrero de 2020, el apelante luego de buscarla en el colegio detuvo el vehículo en un lugar solitario con poco tránsito automovilístico, el cual siempre describió como un área donde había un árbol de mangó y un puente.[182] Lo que no fue rebatido por el apelante. Allí, relató que el señor Rodríguez Torres le introdujo el dedo del corazón de la mano izquierda en su vagina y le apretó la tetilla del seno izquierdo.[183]

Ahora bien, el apelante arguyó que el testimonio de la menor C.M.O.S. carecía de credibilidad, toda vez que se apreciaban incongruencias entre lo declarado por ella en el juicio y lo que esta les relató a los otros testigos de cargo del Ministerio Público. En

---

[181] Nació el 5 de octubre de 2004, por lo cual, para el mes de febrero de 2020, tenía quince años y varios meses. *Véase,* TPO del 30 de julio de 2024, a la pág. 138, líneas 22-23.

[182] *Íd.*, a la pág. 146, líneas 1-15 y líneas 21-28; y a la pág. 147, líneas 1-6.

[183] *Íd.*, líneas 7-21 y líneas 25-28; y a la pág. 148, líneas 1-4.

específico, señaló contradicciones respecto a si se quitó o bajó parte de la ropa, la alegada mano que utilizó, cuál fue el dedo introducido en la vagina; así como la situación de los senos de la menor.

No obstante, concordamos con el Ministerio Público que dichas incongruencias son inconsecuentes y no inciden sobre los elementos medulares. Lo testificado por la menor C.M.O.S.,[184] la señora Pagán Pagán,[185] el señor García Couvertier,[186] la Agente Morales Avilés[187] y el Agente Sánchez Luciano[188] coinciden en que el señor Rodríguez Torres le introdujo el dedo en la vagina a la menor y subsiguientemente, tocó el seno de ella. Las discrepancias con relación a si la menor C.M.O.S. se quitó el pantalón o se lo bajó hasta las rodillas, si fue ella que se alzó la camisa y el brasier o el apelante y la manera de que el seno fuera tocado son inmateriales para la consumación de los delitos imputados. En este punto, recordemos que la menor, en su declaración en el juicio, claramente aseguró que ella fue quien se alzó la camisa a solicitud del apelante, a quien ella veía como una figura de autoridad.

Por otro lado, no podemos obviar que la Agente Morales Avilés declaró que **entrevistó a la menor C.M.O.S., entre cuatro a cinco ocasiones, y que nunca esta cambió la versión**.

De igual forma, surge del testimonio vertido por el Evaluador Forense García Couvertier, que este afirmó que en cuestiones narrativas pudieran surgir algunos cambios y que la diferencia de palabras entre las entrevistas podía ser indicativo de que la menor C.M.O.S. no estaba utilizando un libreto.[189]

---

[184] *Íd.*, a la pág. 147, líneas 15-21; y a la pág. 148, líneas 1-4.

[185] *Íd.*, a la pág. 63, líneas 22-27; y a la pág. 64, líneas 5-10.

[186] *Véase*, TPO del 31 de julio de 2024, a la pág. 286, líneas 13-20 y líneas 23-27; y a la pág. 287, líneas 1-3.

[187] *Íd.*, a la pág. 319, líneas 2-16.

[188] Véase, TPO del 1 de agosto de 2024, a la pág. 374, líneas 7-19.

[189] Véase, TPO del 31 de julio de 2024, a la pág. 289, líneas 8-27; y a la pág. 290, líneas 1-9. Destacamos que, analizado en su totalidad el *Informe Pericial* emitido por el Evaluador Forense García Couvertier con fecha del 21 de diciembre de 2021 (Autos Originales), el mismo es cónsono con el testimonio vertido.

Asimismo, este aseguró que los relatos que la menor le narró en las dos entrevistas que le realizó, fueron cónsonos y no encontró indicios de alegación falsa. También, el Evaluador Forense sostuvo que en la narrativa de los eventos pueden existir diferencias en las distintas entrevistas y enfatizó que la menor mantuvo su testimonio sobre los actos medulares sin él haberle ofrecido alguna información.

Más aún, el Evaluador Forense García Couvertier descartó motivación o ganancia ulterior. Respecto a esto último, este explicó que **después de ver la narrativa, la menor C.M.O.S. habló con bastantes descripciones, se mantuvo consistente en todo momento, no tuvo problemas en narrar los eventos de ninguna forma y también notó que no estaba utilizando un libreto, por lo que descartó motivación o ganancia ulterior.** Lo cual no pudo ser controvertido por el apelante. A esto, añadimos que las acusaciones de la menor en contra del señor Rodríguez Torres conllevaron que esta fuera separada de su madre, removida del hogar y; por consiguiente, terminara viviendo sola, lo que, a nuestro entender, le resta mérito al argumento de que la menor realizó las declaraciones en su contra por rencor, odio o desagrado. Es decir, no cabe duda, de que las consecuencias de sus expresiones acarrearon resultados personales difíciles para su convivencia como joven. A su vez, reiteramos que quedó ampliamente demostrado que la menor siempre realizó declaraciones similares de los eventos desagradables ocurridos en su contra por el apelante.

De otra parte, el Evaluador Forense García Couvertier señaló que las manifestaciones de la menor verbalizadas en las entrevistas colaterales que le hicieron fueron consistentes con las expresadas en las dos entrevistas que él llevó a cabo.[190] Por lo que, concluyó que

---

[190] *Íd.*, a la pág. 299, líneas 1-12.

las alegaciones en contra del ofensor identificado por la menor C.M.O.S, señor Rodríguez Torres, se sostenían.

Enfatizamos que el Tribunal Supremo ha reiterado que el hecho de que un testigo incurra en contracciones no obliga al juzgador a descartar la totalidad de su declaración. *Pueblo v. Espinet Pagán*, supra, a la pág. 536; *Pueblo v. López Rivera*, supra, a las págs. 365-366; *Pueblo v. Méndez Feliciano*, supra, a la pág. 450. De igual manera, las incongruencias o inconsistencias entre testigos sobre hechos no esenciales no obligan a descartar toda la prueba. *Pueblo v. Reyes Morán*, supra, a la pág. 794; *Pueblo v. Feliciano Hernández*, supra, a la pág. 373 (1982). Así, dado que el juzgador de los hechos estuvo en mejor posición que esta *Curia* para dirimir prueba conflictiva, debe prevalecer su determinación. *Pueblo v. Maisonave Rodríguez*, supra.

A su vez, subrayamos que es un principio normativo de que no existen testimonios perfectos, máxime cuando entre los hechos acecidos en febrero de 2020 y el juicio comenzado en julio de 2024 transcurrieron más de cuatro años. Asimismo, no podemos ignorar que la menor tenía 15 años de edad cuando fue víctima de los actos en su contra.

Por otra parte, coincidimos con el Ministerio Público que, de los hechos narrados por el señor Rodríguez Torres a la señora Pagán Pagán, se confirmaron varios de los detalles declarados por la menor C.M.O.S. Por ejemplo, el apelante narró que: recogió a la menor en la escuela; que ella le comentó que una compañera le introdujo el dedo en su vagina; que detuvo su vehículo en ese momento; que le bajó la ropa a la menor C.M.O.S., aunque no se la quitó; y **que la**

**tocó por el área de los ovarios mientras le preguntaba que si le dolía**.[191]

Por último, la alegación referente a que la menor efectuó las manifestaciones en contra del apelante el 4 de junio de 2021 por rencor, odio o desagrado, según especificada por el señor Rodríguez Torres en el recurso ante nuestra consideración, no encuentra apoyo en la evidencia presentada. Acorde con lo antes explicado y de los testimonios surge que la menor estaba feliz en la convivencia familiar, incluso el día antes de declarar en contra del apelante, cuando sucedió la situación con el *Wi-Fi* y la negativa para la adquisición de *data* para el celular.[192] Además, la licenciada Fátima expresó que en la última conversación con la menor, esta le expresó que los sentimientos hacia el apelante eran positivos.[193] Tampoco obviemos que la madre de la menor señaló que su hija nunca le dijo que odiaba al señor Rodríguez Torres,[194] lo cual fue cónsono con lo que la menor le manifestó al Evaluador Forense.

De igual manera, sobre este particular, recordemos que el Evaluador Forense García Couvertier, de las entrevistas realizadas a la menor, no encontró motivación o ganancia ulterior como previamente explicamos. A su vez, este aseveró que, aunque se evidenció una interrelación disfuncional entre la menor y el apelante, no demostró que ella tuviera una memoria inducida que la llevara a realizar una manifestación en contra del señor Rodríguez Torres.

Por otro lado, cuando la menor expresó su bisexualidad, en diciembre de 2019, no fue rechazada por la familia, ni menos por el apelante, quien lo tomó *normal* y la apoyaba. Lo que, a nuestro

---

[191] Véase, TPO del 30 de julio de 2024, a la pág. 66, líneas 7-20. Además, véase Exhibit 1 del Ministerio Público, *Entrevista a TS Irma Pagán Pagán-9 de agosto de 2021 del Informe Pericial,* supra, a la pág. 17. (Autos Originales)
[192] Véase, TPO del 31 de julio de 2024, a la pág. 348, líneas 5-18; Véase, TPO del 1 de agosto de 2024, a la pág. 506, líneas 24-26 y a la pág. 507, líneas 1-5.
[193] *Íd.*, a la pág. 442, líneas 18-24.
[194] *Íd.*, a la pág. 513, líneas 4-9.

entender, de haber sido repudiada, pudiera ser un motivo para molestarse con este y actuar en su contra. Incluso, luego de haberle mencionado dicha información a su madre y al señor Rodríguez Torres se mudaron a la casa de él. Tampoco ignoremos que la menor nunca denunció al apelante mientras este le hacía comentarios de índole sexual una vez ella le comentó que era bisexual. Es decir, no se presentó prueba que evidenciara alguna animosidad de la menor en contra del señor Rodríguez Torres, aun cuando ella había expresado que no se sentía cómoda ni segura en la presencia de este.

Por ello, aquilatada la prueba documental y testifical desfilada en el juicio, el jurado encontró al señor Rodríguez Torres culpable por los delitos de agresión sexual y actos lascivos. Así pues, tras no encontrar la existencia de pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba oral del juzgador de los hechos, le concedemos deferencia por estar en mejor posición para dirimir la credibilidad de los testigos y a adjudicar la evidencia presentada.

En virtud de lo anterior, colegimos que el Ministerio Público cumplió con establecer los elementos según tipificados en el Artículo 130 y el Artículo 133(a) del Código Penal, *supra*, toda vez que estuvieron sustentados en la prueba testifical y documental desfilada en el juicio, por lo que no procedía la absolución del acusado.

**IV.**

Por los fundamentos antes expuestos, confirmamos la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del

Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones